## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHARLESTON AREA MEDICAL CENTER**, *et al.*, | |
| **Plaintiffs,** | |
| v. | Civil Action No. 15-2031 (JEB) |
| **SYLVIA M. BURWELL, Secretary, U.S. Department of Health and Human Services**, *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Vintage threads, for some thrift-shop customers, may seem novel and chic.  Not so with well-worn legal disputes.  The issues presented in the instant Motion have already been litigated before four different district judges, all of whom have come to roughly consistent conclusions. Like those cases, this suit involves a group of Plaintiffs — 35 acute-care hospitals participating in the Medicare program — that challenges regulations promulgated by the Department of Health and Human Services in an effort to obtain extra reimbursements for treating a number of extraordinarily costly patients.  Just as in those cases, Defendant — the Secretary of HHS — submitted an administrative record reflecting the rules and policies at issue.  Yet the Hospitals want more.

In the present Motion, they complain of various missing documents, formulas, and data. The Secretary, on the other hand, opposes any expansion of the record.  Seeing as these matters have been rigorously and persuasively examined in numerous other opinions, the Court finds no reason to shamble off the beaten path to walk the road not taken.  Like those other courts, this

Court will grant the Motion to Compel Production in part and deny it in part.  Once the record is complete, the Court will entertain motions for summary judgment on the merits.

## I.      Background

Medicare cases similar to this one have been dubbed "labyrinthine."  Dist. Hosp. Partners, L.P. v. Burwell (Dist. Hosp. Partners II), 786 F.3d 46, 48 (D.C. Cir. 2015) (quoting Adirondack Med. Ctr. v. Sebelius, 740 F.3d 692, 694 (D.C. Cir. 2014)).  Luckily, several other courts' decisions have laid the groundwork for the present Opinion.  See Univ. of Colo. Health at Mem'l Hosp. v. Burwell (Univ. of Colo. Health I), 151 F. Supp. 3d 1 (D.D.C. 2015), reconsidered in part, Univ. of Colo. Health II, 164 F. Supp. 3d 56 (D.D.C. 2016); Lee Mem'l Hosp. v. Burwell, 109 F. Supp. 3d 40 (D.D.C. 2015); Dist. Hosp. Partners, L.P. v. Sebelius (Dist. Hosp. Partners I), 971 F. Supp. 2d 15 (D.D.C. 2013), aff'd, Dist. Hosp. Partners II, 786 F.3d 46; Banner Health v. Sebelius (Banner Health I), 945 F. Supp. 2d 1 (D.D.C. 2013), reconsidered in part, Banner Health II, No. 10-1638, 2013 WL 11242368 (D.D.C. July 30, 2013).  The Court will thus provide only a bare-bones statutory and regulatory background before moving to the facts of the present suit.

The federal Medicare program funds medical care for elderly or disabled persons by reimbursing hospitals for services that they provide those patients.  See Ne. Hosp. Corp. v. Sebelius, 657 F.3d 1, 2 (D.C. Cir. 2011); see also 42 U.S.C. § 1395 et seq.  The Center for Medicare and Medicaid Services (CMS), a component of HHS, cuts those checks.  See Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 275 (2006).

For how much money is the key question.  Although the federal government once doled out funds based on the amounts that hospitals purportedly spent, this created a perverse incentive: "[t]he more they spent, the more they were reimbursed."  Cty. of L.A. v. Shalala, 192

F.3d 1005, 1008 (D.C. Cir. 1999) (quoting <u>Tucson Med. Ctr. v. Sullivan</u>, 947 F.2d 971, 974 (D.C. Cir. 1991)).  Responding to this concern in 1983, Congress shifted to the present-day system of reimbursing hospitals a fixed sum for each diagnosis.  <u>See</u> 42 U.S.C. § 1395ww(d).  In other words, if two patients had the same illness, they then fell within the same diagnosis-related group (DRG), and CMS would apply the same DRG reimbursement rate to each.  <u>See</u> <u>Cape Cod Hosp.</u> <u>v. Sebelius</u>, 630 F.3d 203, 205-06 (D.C. Cir. 2011).  The amount of the particular DRG rates would depend on how much medical services for certain conditions usually cost.  <u>Id.</u>

 Yet treatment of patients, once in a while, will end up being exorbitantly pricey.  To save hospitals from footing the bill for these "outliers," the Medicare Act provides:

> . . . [A] hospital may request additional payments in any case where charges, adjusted to cost, . . . exceed the sum of the applicable DRG prospective payment rate . . . plus a fixed dollar amount determined by the Secretary.

42 U.S.C. § 1395ww(d)(5)(A)(ii).  That is, a hospital may obtain outlier payments when its charges (with some adjustment) exceed the DRG rate plus some threshold.  Or, to break the provision down mathematically, outlier payments are possible when:

$$\text{``charges, adjusted to cost''} > \text{DRG rate} + \text{``fixed dollar amount''}$$

<u>Id.</u>  At issue here are regulations pertinent to the first and third variables.

 First, by "charges, adjusted to cost," the outlier statute simply means that CMS looks at what hospitals <u>charge</u> their patients, but then adjusts those charges to reflect what treatment actually <u>costs</u>.  In other words, some hospitals might radically overcharge — or, in Medicare's street-racing terminology, "turbocharge" — in an effort to qualify for undeserved outlier payments.  To combat this problem, CMS does not take hospitals' <u>reported</u> charges at face value, but rather applies a discount based on data of how each hospital marks up its costs — a hospital-specific adjustment known as the "charge-to-cost ratio[]."  <u>See</u> 42 C.F.R. § 412.84(i)(2).  In

2003, HHS promulgated an outlier-payment regulation that amended the methodology for calculating that ratio and a procedure under which excess payments could be retroactively revised through a "reconciliation" process.  See 68 Fed. Reg. 34,494 (June 9, 2003).

Next, for hospitals to request added reimbursements, the adjusted charges for a patient must be greater than the baseline DRG rate and "a fixed dollar amount."  42 U.S.C. § 1395(d)(5)(A)(ii).  That amount is also known as the "fixed-loss threshold" — *i.e.*, the statute contemplates that hospitals will eat a fixed loss before asking CMS to cover for outliers.  Before each fiscal year, as part of an omnibus rulemaking, the Secretary promulgates that year's fixed-loss threshold.  See 42 C.F.R. § 412.80(a).  Broadly speaking, those yearly thresholds take into consideration adjustments for historical data of past years' outlier payments and inflation.  See, e.g., 77 Fed. Reg. 53,258 (Aug. 31, 2012); 76 Fed. Reg. 51,476 (Aug. 18, 2011); 75 Fed Reg. 50,042 (Aug. 16, 2010).

In November 2015, 35 hospitals filed the instant lawsuit after litigating various outlier-payment claims through the Medicare-appeals process.  Specifically, the Hospitals challenged that CMS had underpaid them by adhering to two sets of unlawful regulations — the 2003 regulations expounding on the charge-to-cost ratio and the fixed-loss-threshold regulations for fiscal years 2011, 2012, and 2013.  See ECF No. 8 (Amended Complaint) at 40.  Allegedly, Defendant now owes some $939 million in forgone outlier payments for those years.  Id. at 33.

In this Court, the parties agreed that for the 2011 and 2012 regulatory challenges, the Secretary would produce the administrative-rulemaking record from another case in this district.  See ECF No. 13 (citing Univ. of Colo. Health I, 151 F. Supp. 3d 1).  The Hospitals, however, "reserve[d] the right to challenge the completeness" of those records.  Id.  Consistent with the

parties' stipulation, the Secretary then produced to Plaintiffs records for those years and also each

of the other challenged rulemakings.  See ECF No. 19 (Certification of Administrative Record).

      Plaintiffs remain unsatiated and have now filed a Motion to Compel Production.

## II.    Legal Standard

      In any regulatory challenge, the Court's "review is to be based on the full administrative

record that was before the Secretary at the time [s]he made h[er] decision." Citizens to Preserve

Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971); see 5 U.S.C. § 706 ("[T]he court shall

review the whole record or those parts of it cited by a party . . . .").  As part of the record, the

Court may consider "any document that might have influenced the agency's decision" and not

merely those documents the agency expressly relied on in reaching its final determination.  Nat'l

Courier Ass'n v. Bd. of Governors of Fed. Reserve Sys., 516 F.2d 1229, 1241 (D.C. Cir. 1975);

see Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).

The goal, ultimately, is for the Court to have before it a "record that delineates the path by which

[the agency] reached its decision." Occidental Petroleum Corp. v. SEC, 873 F.2d 325, 338 (D.C.

Cir. 1989).

      And so the agency is responsible for producing an administrative record.  See Univ. of

Colo. Health I, 151 F. Supp. 3d at 12.  When the agency does so, the record "is entitled to a

strong presumption of regularity." Sara Lee Corp. v. Am. Bakers Ass'n, 252 F.R.D. 31, 34

(D.D.C. 2008); see Marcum v. Salazar, 751 F. Supp. 2d 74, 78 (D.D.C. 2010).  A plaintiff may

show that the record is "[i]nsufficien[t]" — i.e., incomplete — only if she is able to "specif[y]

. . . documents that ha[ve] been omitted." NRDC v. Train, 519 F.2d 287, 291 (D.C. Cir. 1975).

In other words, "a plaintiff must put forth concrete evidence" and "'identify reasonable, non-

speculative grounds for its belief that the documents were considered by the agency and not

included in the record.'"  Marcum, 751 F. Supp. 2d at 78 (quoting Pac. Shores Subdivision Cal.

Water Dist. v. U.S. Army Corps of Eng'rs, 448 F .Supp. 2d 1, 6 (D.D.C. 2006)).  Then, if the

Court finds that the record produced "clearly do[es] not constitute the 'whole record' compiled

by the agency," it will order the agency to complete the record.  Overton Park, 401 U.S. at 419

(quoting 5 U.S.C. § 706).

**III.     Analysis**

        The Hospitals and Secretary presently dispute what documents comprise the

administrative record for the 2003 outlier-payment regulation and the 2011-2013 fixed-loss-

threshold regulations.  All of those regulations, Plaintiffs believe, were unlawful and led to them

being compensated too little for outliers during the fiscal years between 2011 and 2013.  To

avoid burdening the reader with reams of regulatory minutiae, the Court will save describing

those sought-after documents for each of the following subsections.

        Before proceeding, it also bears noting that similar cases have formed a chorus in this

district.  More often than not, those other courts have considered many of the same types of

documents and regulations that are at issue here, albeit generally for outlier disputes from other

fiscal years.  See Univ. of Colo. Health I, 151 F. Supp. 3d 1 (challenging payments for fiscal

years 2007 to 2008 and 2011 to 2012); Lee Mem'l Hosp., 109 F. Supp. 3d 40 (same for 2008 to

2010); Dist. Hosp. Partners I, 971 F. Supp. 2d 15 (same for 2004 to 2006); Banner Health I, 945

F. Supp. 2d 1 (same for 1998 to 2006).

        Here's the coda: In instances where the choir is in harmony, this Court finds no reason to

sing out of key.  Not only are the lengthy opinions of those district judges persuasive, but

deviating on this procedural issue could also result in substantive results that are inconsistent

among different fiscal years.  That is, this Court would not want the validity of annual

regulations — which are promulgated following largely similar notice-and-comment processes
— to vary depending on the scope of the record on which they are reviewed.  See Opp. at 6-7
(describing yearly process).  With this understanding in mind, this Court first considers
documents relevant to the 2003 rule before moving on to the 2011-2013 rules.

A.   2003 Outlier-Payment Regulation

To start, Plaintiffs seek to add to the record documents pertaining to the 2003 outlier-
payment regulation.  In particular, the Hospitals say three sets of documents are missing: (1) the
interim final rule, (2) the impact file, and (3) documents relating to a regulatory-impact analysis.
The Court walks through each.

1.   *Interim Final Rule*

Plaintiffs' first request requires delving into some further regulatory history.  Before the
Secretary promulgated the 2003 regulation, he considered whether not only to amend the charge-
to-cost-ratio provisions but also to reset the fixed-loss thresholds for the remainder of 2003.
Pursuant to Executive Order 12866, HHS submitted to the Office of Management and Budget for
further review an interim final rule addressing both variables.  See Mot., Exh. A (Interim Final
Rule).  That rule would have immediately lowered the fixed-loss threshold for 2003, cutting it by
over one-third to $20,760.  See id. at 38.  But, after OMB review, the change was abandoned.
Although the final 2003 outlier-payment regulation (issued roughly a month later) tweaked the
charge-to-cost methodology, it "concluded it is more appropriate to maintain the threshold at
$33,560."  68 Fed. Reg. at 34,506.

The relevance of the interim final rule is not hard to grasp.  "The Interim Final Rule is . . .
highly probative in determining the rationality of the agency's chosen path."  Univ. of Colo.
Health I, 151 F. Supp. 3d at 18.  In attacking the 2003 outlier-payment regulation, Plaintiffs are

entitled to have as part of the record "alternatives that the agency considered on the path to reaching its decision." Banner Health I, 945 F. Supp. 2d at 23.  One alternative HHS considered, before formulating its final course of action, was to amend not only the charge-to-cost methodology but also the fixed-loss threshold — an alternative memorialized in the interim regulation.  See Opp. at 14 ("[T]he Secretary considered but ultimately decided against issuing [the] rule . . . .").  The courts in this district are thus in agreement that the interim final rule should be part of the administrative record.  See Univ. of Colo. Health I, 151 F. Supp. 3d at 18; Lee Mem'l Hosp., 109 F. Supp. 3d at 48; Dist. Hosp. Partners I, 971 F. Supp. 2d at 31; Banner Health I, 945 F. Supp. 2d at 26; see also Dist. Hosp. Partners II, 786 F.3d at 55 n.3 (finding no abuse of discretion in District Hospital Partners I).

Defendant's only argument against this approach is to assert that the interim rule is irrelevant as Plaintiffs here attack only the cost-to-charge-ratio rules set out in the 2003 regulation and not the fixed-loss threshold from that year.  See Opp. at 17-19.  As to any challenged thresholds, she points out, only those from 2011 to 2013 are now at issue.  This argument falls flat, however, as the ratio and threshold are interrelated variables making up a single equation.  If the 2003 regulatory changes had the effect of decreasing a hospital's reported charges, then it would be harder for that hospital to ultimately obtain outlier payments under the equation; HHS, in turn, might reasonably consider lowering the threshold to rebalance the payment calculus.  See 42 U.S.C. § 1395ww(d)(5)(A)(ii).  The fact that the Secretary did not lower the threshold is at least probative of whether modifying only the method to calculate the ratio was rational.  The Hospitals are thus entitled to the interim final rule to challenge how the charge-to-cost-ratio regulation was promulgated.

### 2. *Impact File*

Next, Plaintiffs desire to complete the record with the impact file for the 2003 rulemaking.  Impact files essentially contain data on different providers that HHS used in arriving at annual fixed-loss thresholds.  See Opp., Exh. A (Declaration of Ing-Jye Cheng), ¶¶ 4(d), 8, 12, 15.  Although the Secretary included in the administrative record the impact files for the 2011, 2012, and 2013 threshold regulations, she did not include one for the 2003 outlier-payment regulation.  See Certified Administrative Record.  The assumption, it seems, was that the fixed-loss threshold for 2003 is irrelevant to the Hospitals' challenge to the charge-to-cost-ratio changes from that same year.  See Cheng Decl., ¶ 16 ("It seems unlikely that it would have been considered because Impact Files are considered instead in the [fixed-loss-threshold] rulemakings.").

As described in the prior subsection, that assumption is faulty.  In the 2003 outlier-payment regulation, HHS <u>did</u> consider modifying the fixed-loss threshold; in any event, any change (or lack thereof) to the threshold is relevant to Plaintiffs' ratio objections.  This Court thus aligns itself with the other courts that have also required the Secretary to include the 2003 impact file.  See Univ. of Colo. Health I, 151 F. Supp. 3d at 19; Lee Mem'l Hosp., 109 F. Supp. 3d at 49; Banner Health I, 945 F. Supp. 2d at 32-33.

### 3. *Regulatory-Impact-Analysis Documents*

To complete their triad of requests, the Hospitals ask for "data, equations, assumptions, and analyses" pertaining to a regulatory-impact analysis completed for the 2003 outlier-payment regulation.  See Mot. at 27.  The regulatory-impact analysis itself was published as the final section of the rule.  See 68 Fed. Reg. at 34,513-14.  In that analysis, HHS reported that its charge-to-cost-ratio changes were expected to reduce outlier payments by roughly $145 million.

See id.  Plaintiffs contend that there must have been further data-driven studies that backed up this number, which otherwise appeared out of the blue.  They, in essence, want that data.

On this front, however, Plaintiffs have not carried their burden to show that such data exists.  They are able to specify no actual "document[] that ha[s] been omitted."  NRDC, 519 F.2d at 291; see Univ. of Colo. Health I, 151 F. Supp. 3d at 26.  Instead, their argument rests on the assumption that because HHS came up with a number, that number must have been founded on further analyses that were recorded.  Yet "such assumptions do not rise to the level of 'concrete evidence' that the underlying analysis allegedly missing from the record was considered by the Secretary" or "documented or memorialized in some way."  Banner Health I, 945 F. Supp. 2d at 29; see Univ. of Colo. Health I, 151 F. Supp. 3d at 27 (refusing to require inclusion in record of regulatory-impact analysis of a fixed-loss-threshold regulation).   The Hospitals likewise offer no reason why the Court must look at the underlying data and, presumably, Plaintiffs' full replication of the regulatory-impact analysis — as opposed to the Secretary's analysis — to understand the agency's course of action.  See Lee Mem'l Hosp., 109 F. Supp. 3d at 56; Banner Health I, 945 F. Supp. 2d at 29-30.  As Plaintiffs offer no further evidence suggesting a need for or entitlement to these documents, this Court will not require production of materials relating to the 2003 rulemaking's regulatory-impact analysis.

* * *

In sum, the Court finds that the Secretary must complete the record by adding the 2003 outlier-payment regulation's interim final rule and impact file, but need not produce documents pertaining to her regulatory-impact analysis.

B.  <u>2011-2013 Fixed-Loss-Threshold Regulations</u>

With the 2003 regulation out of the way, this Court moves on to discuss the fixed-loss-threshold regulations promulgated in 2011 to 2013.  The documents Plaintiffs seek are legion. They desire a plethora of data, formulas, and other analyses, all of which fall into four broad categories: (1) formulas and data used to calculate the relevant fixed-loss thresholds and prior years' thresholds; (2) the actuarial analysis and data underlying the so-called cost-to-charge-ratio adjustment factors; (3) data used to calculate the so-called inflation factors; and (4) documents relating to reconciliation.

Before the Court marches through these requests in apparatchik-like fashion, it pauses to make some general observations that may make this slog easier.  As a procedural note, the Secretary has stipulated here that for the 2011 and 2012 fixed-loss-threshold regulations, the records in <u>University of Colorado Health I</u>, 151 F. Supp. 3d 1, would be produced.  <u>See</u> ECF No. 13.  Although Plaintiffs reserved their rights to ask for <u>more</u>, Defendant has, in effect, assured that no <u>less</u> than that case's administrative record shall be produced.  <u>See id.</u> ("Plaintiffs reserve the right to challenge the completeness of all administrative rulemaking records . . . ."); <u>see also</u> <u>Univ. of Colo. Health,</u> No. 14-1220, ECF No. 52 (post-decision revised certified administrative record).  That case thus serves as a sturdy guidepost here.  As the Secretary does not argue that the 2013 regulations should be treated differently from the other two, the only remaining issue is whether Plaintiffs have shown that even more should be produced than in <u>University of Colorado Health</u>.

Second, as will soon become apparent, the fixed-loss-threshold rulemakings are long, dense, and unwieldy.  Although the Hospitals initially requested a slew of additions to the administrative record, the Secretary has carefully explained in most situations how the

information that Plaintiffs seek is actually already in the record, albeit hard to find.  When that is

so, there is, of course, no basis on which the Court can ask Defendant to further add to the

record.

      With those prefatory remarks out of the way, the Court addresses the four broad

categories of materials relating to the 2011, 2012, and 2013 fixed-loss-threshold regulations.

### 1.  *Formulas and Data Trims*

      To start, the Secretary produced the underlying data of Medicare-hospital billing —

known as "MedPAR" data — used to calculate the 2011-2013 fixed-loss thresholds.  Plaintiffs

contend, however, that missing are formulas for that data and so-called data "trims" — *i.e.*, how

the Secretary tailored the data set before running her formulas — as well as formulas and data

for prior years' threshold regulations.  As evidence that this information exists, the Hospitals

point out that in each of the yearly regulations, HHS has conceded that it applied certain

formulas to "simulate[] payments."  <u>E.g.</u>, 77 Fed. Reg. at 53,691; 76 Fed. Reg. at 51,792; 75 Fed.

Reg. at 50,427.

      As to the request for the formulas from the challenged fiscal years, one other court has

rejected a similar demand.  <u>See</u> <u>Banner Health I</u>, 945 F. Supp. 2d at 29-30.  And although two

courts previously required the Secretary to produce such documents, <u>see</u> <u>Univ. of Colo. Health I</u>,

151 F. Supp. 3d at 19-21; <u>Lee Mem'l Hosp.</u>, 109 F. Supp. 3d at 50-51, they later withdrew their

orders to do so.  In <u>University of Colorado Health II</u>, the district court went back on its original

order to produce formulas after the Secretary clarified that all the relevant formulas were already

in the administrative record.  <u>See</u> 164 F. Supp. 3d at 64.  Likewise, in <u>Lee Memorial Hospital</u>, in

response to the Secretary's averment that "HHS does not possess materials that are responsive to

the[] [formula request] that have not already been included in the administrative record," the

district court issued a minute order requiring no further supplementation on that front.  See No.

13-643, ECF No. 68 at 2; see also id., Minute Order (Aug. 18, 2015).  Here, too, the Secretary

explains precisely where in the administrative record to find the relevant formulas.  See Cheng

Decl., ¶¶ 18-30.

Plaintiffs offer three responses, none of which is persuasive.  First, they argue that "HHS

may not fill the gaps in the administrative record by way of a declaration that purports to provide

a post hoc roadmap."  Reply at 18.  The point, however, is not that the Secretary is making up

new formulas after the fact, but that those formulas were there all along, albeit perhaps buried

within pages and pages of regulations.  Second, the Hospitals contend that explanation of a

particular variable used in the formulas — known as the "standardized amount" — is still

missing from the record.  See id.  But this is not so, as each rulemaking's Appendix B describes

the standardized amounts and how they are modified year to year.  See 77 Fed. Reg. at 53,749;

76 Fed. Reg. at 51,844-45; 75 Fed. Reg. at 50,675-77.

Plaintiffs last bring a general complaint that it defies explanation how the fixed-loss

thresholds decreased every year when hospitals' costs increased, as, if that were so, the Secretary

would be hemorrhaging funds.  See Reply at 18-19.  In other words, it seems that HHS was

making it easier and easier for hospitals to obtain outlier payments by decreasing the amount of

charges required to obtain payments when charges themselves were increasing.  The Secretary

could not be so generous, the Hospitals assert.  Some secret formula, then, must be missing.  Yet

here, the Hospitals admit that they can point to no specific data, formula, or other document.  See

id. at 20 n.7 ("The Hospitals cannot specify every undisclosed document.").  To the extent that

the regulations appear illogical in needlessly overburdening the Medicare fisc, that may be

argued in a challenge to the merits of the regulation.

The remaining requests appear to be abandoned.  With regard to the data trims, although the Hospitals initially requested to know how the Secretary sliced and diced the MedPAR data set, they no longer pursue that argument in their Reply.  <u>See</u> Mot. at 29-30.  No doubt this is because, as with the formulas, Defendant explained precisely how it trimmed its data in the regulations.  <u>See</u> 77 Fed. Reg. at 53,526; 76 Fed. Reg., at 51,557-59; 75 Fed. Reg. at 50,129-35; <u>see also</u> Cheng Decl., ¶ 41.  The D.C. Circuit, moreover, has held that it is unnecessary to provide trimmed files, as the full MedPAR files are available.  <u>See</u> <u>Dist. Hosp. Partners II</u>, 786 F.3d at 55-56.  Finally, Plaintiffs explicitly withdrew in their Reply brief their formula-and-data request from fiscal years <u>before</u> 2011.  <u>See</u> Reply at 20.

2.  *Actuarial Analysis and Data for Cost-to-Charge-Ratio Adjustment Factors*

Next, Plaintiffs seek documents relating to the charge-to-cost-ratio adjustment factor, which is used to compute the yearly fixed-loss threshold.  That factor essentially fixes a discrepancy between the charge-to-cost ratio used to arrive at the fixed-loss threshold and the ratio actually applied months later to calculate outlier payments.  <u>See</u> <u>Univ. of Colo. Health I</u>, 151 F. Supp. 3d at 21-22; <u>Lee Mem'l Hosp.</u>, 109 F. Supp. 3d at 53.  The Hospitals point out that in each year's regulation, HHS explains that it worked with CMS's Office of the Actuary on this factor.  <u>See</u> 77 Fed Reg. at 53,692; 76 Fed. Reg. at 51,792; 75 Fed. Reg. at 50,427-29.  Plaintiffs thus request the actuarial analysis as well as other charge-to-cost data relevant to the adjustment factor.

With regard to the actuarial analysis, two courts have already explained that the rulemakings already contain "the full methodology" that HHS employed.  <u>Univ. of Colo. Health I</u>, 151 F. Supp. 3d at 22; <u>Lee Mem'l Hosp.</u>, 109 F. Supp. 3d at 54 ("HHS cogently explained how it calculates cost-to-charge adjustment factors . . . .").  As to any further "actuarial analysis" done

by the Office of the Actuary, there appears to be none.  CMS merely provides a "'plug-in'

number" for HHS to apply in its rulemaking, and those numbers are then recorded in the

rulemakings.  <u>See</u> Cheng Decl., ¶¶ 46-47; <u>see also</u> 77 Fed. Reg. at 53,695-96; 76 Fed. Reg. at

51,844-45; 75 Fed. Reg. at 50,429.  No other information can be had.

Likewise, Plaintiffs request for data undergirding the adjustment factor fails as well.

First, the Hospitals admit that "HHS persistently disregarded this actual record data."  Mot. at 33.

If data was never thought to be relevant by the agency, then it is not part of the agency's

decisionmaking record.  Second, and equally fatally, the Secretary points out that those ratios

are, in any event, already part of the record.  <u>See</u> Cheng Decl., ¶ 42.

### 3.  *Data for Inflation Factors*

Another batch of data that Plaintiffs seek pertains to the so-called inflation factor, which

accounts for yearly increases in hospitals' charges and costs.  Here, the Secretary admits —

although she included enough data to find the fixed-loss thresholds for each year, explained how

to go about using that data also to compute the inflation factors, and disclosed the exact inflation-

factor figures — that she did not include an "early update of MedPAR" that would be needed to

reach an exact calculation.  <u>See</u> Opp. at 34; <u>see also</u> Cheng Decl., ¶¶ 48-49.  Nonetheless, she

flags that these early versions contain HIPAA-protected patient information and that the

currently produced data can be used to "closely approximate" the inflation factors.  <u>See</u> Cheng

Decl., ¶¶ 48-49.

To these representations, Plaintiffs apparently have no reply.  And perhaps for good

cause, as, once again, other courts have found on these facts that the early update was an

unnecessary addition to the record.  <u>See</u> <u>Univ. of Colo. Health I</u>, 151 F. Supp. 3d at 23-24; <u>Lee</u>

<u>Mem'l Hosp.</u>, 109 F. Supp. 3d at 54-55.  The point, after all, is to have a record sufficient to

"delineate[] the path by which [the agency] reached its decision." Occidental Petroleum, 873 F.2d at 338. The goal is not to "requir[e] an agency to produce source data upon source data so that its analysis can be replicated in minute detail." Dist. Hosp. Partners I, 971 F. Supp. 2d at 25 (quoting Banner Health I, 945 F. Supp. 2d at 28) . In other words, the claim is that HHS did not act rationally in promulgating the fixed-loss thresholds (not that the agency did not act perfectly), and the data already produced is enough to answer that question.

### 4. *Documents Relating to Reconciliation*

This document-sorting now reaches its anticlimactic end. Plaintiffs last seek documents related to the reconciliation, the process by which CMS could retroactively revise excess outlier payments. Specifically, in the fixed-loss-threshold regulations, HHS announced that it would not consider the effects of reconciliation in calculating the thresholds. See, e.g., 77 Fed. Reg. at 53,696. The agency assumed here that "few hospitals will actually have the[ir] [charge-to-cost] ratio[] reconciled." 75 Fed. Reg. at 50,428; see 77 Fed. Reg. at 53,694; 76 Fed. Reg. at 51,793-94. The Hospitals argue that there must be further documentation supporting this assumption.

Yet the language of the assumption is unadorned by citation to any specific document. Indeed, Plaintiffs, in their Motion, point to none. Although Defendant then responds that the assumption is "consistent" with an Office of the Inspector General report, nowhere does the Secretary say that such a report was actually considered by HHS. See Opp. at 37 (emphasis added); see also Cheng Decl., ¶ 50 (mentioning only that "OIG's report substantiates CMS's prediction"). There is, of course, no need to add to the record information about reconciliation that Plaintiffs are unable to specify and that was apparently never considered. See Univ. of Colo. Health I, 151 F. Supp. 3d at 27; Lee Mem'l Hosp., 109 F. Supp. 3d at 56-57. Indeed, the

Hospitals' claim that the Secretary made a bare, unsupported assumption in its fixed-loss-threshold regulations is better left to the merits.

* * *

Because the Hospitals have not shown that the administrative records for the 2011-2013 fixed-loss-threshold regulations are in any way lacking, the Court finds there to be no need for the Secretary to produce further documents relevant to those rulemakings.

**IV.    Conclusion**

For these reasons, the Court will grant in part and deny in part Plaintiffs' Motion to Compel Production.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 24, 2016